# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>          Plaintiff,<br><br>vs.<br><br>Pedro Ortiz-Gualajara,<br><br>          Defendant. | CR 16-01654-TUC-RM (JR)<br><br>**REPORT AND RECOMMENDATION** |

This matter was referred to Magistrate Judge Rateau for pretrial matters. On February 1, 2017, Defendant Pedro Ortiz-Gualajara filed a Motion to Suppress Stop Based on Lack of Reasonable Suspicion to Conduct Investigatory Stop (Doc. 17). The Government filed a Response on February 14, 2017 (Doc. 18). The defense did not file a reply. The matter was heard by the Court on April 4, 2017. Defendant was present and represented by counsel. The Government and the Defendant each presented one witnesses. Nine exhibits were admitted at the hearing. Having

considered the matter, the Magistrate Judge recommends that Defendant's motion be granted.[1]

**I.    Findings of Fact**

Border Patrol Agent Frank Agudio testified that he has been a United States Border Patrol Agent for approximately 8½ years. Tr. 5.[2] Before becoming an agent, he attended the Border Patrol Academy in Artesia, New Mexico, for approximately 5½ months, and in 2012 attended the canine academy in El Paso, Texas, for approximately two months. Tr. 5.

Agent Agudio is assigned to the U.S. Customs and Border Protection ("CBP") Willcox Station with an area of responsibility extending west from the Arizona/New Mexico border to an area near the Sonoita, Arizona exit on Interstate 10. Tr. 5. Agents from the Willcox Station work three checkpoints located on U.S Route 191, Arizona State Route 80, and Arizona State Route 90. Tr. 5-6. As a canine handler, Agent Agudio's highest priority is the State Route 90 checkpoint, located at Mile Marker 304 near the small town of Whetstone, Arizona. Tr. 6. SR 90 is a frequently used highway located approximately 30 miles north of the Mexico border that

---

[1] Trial is scheduled for May 2, 2017 and the plea deadline is April 14, 2017 (Doc. 16). On April 10, 2017, Defendant filed an unopposed motion to continue the trial and plea deadlines (Doc. 33).

[2] "Tr." refers to the transcript of the April 4, 2017 evidentiary hearing.

1 connects to roads that lead away from Arizona/Mexico border and the border towns

2 of Douglas, Sonoita, and Nogales, Arizona. Tr. 8.

3       During his employment with CBP, in addition to conducting canine sniffs,

4 Agent Agudio has conducted primary and secondary inspections, operated the x-ray

5 machine, and has interviewed individuals who have been arrested or apprehended at

6 the checkpoint. Tr. 6-7. From that experience, he is aware that the area around the

7 SR 90 checkpoint is a high traffic area for drug and alien smuggling. Tr. 7.

8       On August 4, 2016, Agent Agudio was assigned to the checkpoint on SR 90

9 and was scheduled to begin his shift at 2:00 p.m. Tr. 8. At about 1:40 p.m., Agudio

10 was driving to work in his take home vehicle, an unmarked dark green Ford F-150

11 with a kennel installed in the rear seat for transporting his canine, when he heard over

12 the radio that the checkpoint was closed due to rainy weather. Tr. 8-9, 11-12, 28, 38

13 (no overhead lights or identifying markings on agent's vehicle); Ex. 3, 4

14 (photographs of Agent Agudio's vehicle). At approximately the same time, he also

15 heard over the radio that the Department of Public Safety had conducted a vehicle

16 stop at the Love's gas station, located near the intersection of SR 90 and I-10, and

17 were requesting canine assistance. Tr. 9. Another canine handler was closer to that

18 scene and Agent Agudio did not respond to the call; however, he recalls hearing that

19 marijuana was found in the vehicle. Tr. 9-10.

20       Because the checkpoint was closed, Agent Agudio stationed his truck in the

21 median at mile marker 302 of SR 90. Tr. 10, 12; Ex. 1 (photograph of location). He

22 positioned his truck perpendicular to traffic, with the front of his vehicle facing east

so that he could watch northbound traffic. Tr. 13, 29. He recalls that he had his rear windows down and that the road was wet. Tr. 13-14. At about 4:40 p.m., Agent Agudio was observing traffic when he heard over the radio that another Border Patrol agent had attempted a vehicle stop and the vehicle fled. Tr. 14. Agent Agudio responded to assist with the pursuit and drove to Tucson where the occupants of the fleeing vehicle abandoned the car behind an automobile dealership at 22nd Street and Wilmot Road. Tr. 14. The two occupants, one an American citizen and the other an illegal immigrant, were ultimately apprehended and two bundles of marijuana along with personal use drugs and a handgun were found in the vehicle. Tr. 14-15.

After that incident, Agent Agudio returned to where he had been parked earlier, the median of SR 90 at mile marker 302. Tr. 15, 17. He arrived at that location at about 7:00 p.m. and was concerned that his nearly 2½ hour absence might have resulted in increased trafficking. Tr. 15, 17. Agent Agudio explained that, through his training and experience, he is aware that drug smuggling operations send out scout vehicles to collect information about Border Patrol operations and relay it back to the drug smugglers. Tr. 15-16. The scouts are paid to determine whether checkpoints are open or closed, whether canines are present at the checkpoints, and the presence and location of law enforcement. Tr. 16. So, as he retakes his position at mile marker 302, the agent is thinking:

> I know the checkpoint's closed, I know there's an increase in smuggling when the checkpoints closed because when the checkpoint's open every vehicle has to stop and get some sort of inspection. When it's closed, I mean, we can't physically stop every vehicle, and we also

4

> have the legal requirements necessary to stop a vehicle. So that's when we see an increase in smuggling when the checkpoint's closed.
>
> I'm also thinking, you know, we've got two marijuana seizures already while the checkpoint was closed. I can't remember a day that we got two marijuana seizures when the checkpoint was open. So that's in my mind: Hey, there's an increase in smuggling going on. You know, Highway 90, like I said before, connects with the border towns of Naco and Douglas so it's frequently used for drug and alien smuggling. I've made many drug and alien smuggling seizures on Highway 90 both when the checkpoint's open and when it's closed.

Tr. 17; *see also* Tr. 56 (checkpoint closure leads to more smuggling).

When he returned to his position in the median of SR 90 at 7:00 p.m., it was still light out and it was not raining. Tr. 17, 30; Ex. 1 (photograph of location); Ex. 9 (Almanac entry reflecting sunset at 7:14 p.m. and dark descent at 8:45 p.m.). Then, at about 7:20 p.m., Agent Agudio noticed an approaching northbound vehicle driven by the Defendant, who the agent could see through the vehicle's front windshield. Tr. 20; Exs. 6, 7 (photographs of Defendant's vehicle). As the Defendant was driving toward the agent's location, he was looking at the agent. Tr. 20-21. Then, as the Defendant reached Agent Agudio's location, he abruptly jerked his head to look away from the agent and accelerated away from the location. Tr. 21, 33, 40. The Defendant's actions stood out to Agent Agudio because it was different than what the rest of the drivers were doing as they drove past him on the highway. Tr. 21, 36. The agent explained that those who are not involved in nefarious activity do not "care that Border Patrol is sitting on the highway," and "just continue about their day, indifferent to me sitting there." Tr. 21.

5

1    Based on the Defendant's reaction to his presence, Agent Agudio decided to
2    follow him and contacted dispatch to conduct records checks on the vehicle. Tr. 23.
3    The records check revealed that the vehicle was registered to the Defendant at a
4    Phoenix address. Tr. 23. Agent Agudio found this significant because, through his
5    experience, "alien and drug smuggling organizations are trying to get to Tucson or
6    Phoenix and especially Phoenix." Tr. 23. The checks also revealed that the vehicle
7    had not crossed through a United States port of entry. Tr. 23. That was significant to
8    the agent because Phoenix is three hours away and those driving from Phoenix are
9    not going to the small town of Whetstone, but a lot of people do travel from Phoenix
10   because they have family in Mexico or for auto repairs or dental work. Tr. 23-24.

11   After following the vehicle for approximately five miles, Agent Agudio
12   conducted a vehicle stop. Tr. 24, 46. When asked to identify the factors he relied on
13   in making the stop, the agent stated:

> So with the checkpoint being closed and the increased smuggling tha[t] occurs when the checkpoint is closed, the fact that a vehicle transporting marijuana was apprehended at 1:40, a vehicle apprehended transporting marijuana was encountered at 4:40, the fact that, because there was a pursuit, we were gone for two and a half hours, the fact that I know that these scout vehicles would have realized that we were gone for two and a half hours, and the fact that Highway 90 is frequently used for drug and alien smuggling when the checkpoint's open and even more so when the checkpoint's closed because it leads away from multiple border cities, the driver looking away from me when he encountered me, the driver accelerating away from me when he encountered me, the fact that the vehicle is registered out of Phoenix and I know through experience that's a place that illegal aliens and drugs are trying to get to, and the fact that it did not cross through a port of entry.

22   Tr. 25.

Based on evidence obtained as a result of the stop, the Defendant was charged with possession with intent to distribute and conspiracy to possess and distribute less than 50 kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D). *Indictment*, Doc. 7. Defendant argues that Agent Agudio did not have reasonable suspicion to stop his vehicle and requests that the Court suppress the evidence obtained as a result of the stop.

**II.     Conclusions of Law**

The Fourth Amendment protects a person against unreasonable searches and seizures. *United States v. Hensley*, 469 U.S. 221, 226 (1985). Consistent with the Fourth Amendment, police may stop persons in the absence of probable cause under limited circumstances. *Terry v. Ohio*, 392 U.S. 1, 88 (1968). The police may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity. *Hensley*, 469 U.S. at 226. Reasonable suspicion exists when an officer is aware of specific articulable facts, that, together with rational inferences drawn from them, reasonably warrant a suspicion that the person to be detained has committed or is about to commit a crime. *United States v. Cortez*, 449 U.S. 411, 416-18 (1981).

When assessing the reasonableness of the police officer's actions, the court must consider the totality of the circumstances which confronted the officer at the time of the stop. *United States v. Sokolow*, 490 U.S. 1, 8 (1989). This assessment precludes a "divide-and-conquer analysis" because even though each of a suspect's acts may be innocent in and of themselves, when taken together, they may warrant

further investigation. *United States v. Arvizu*, 534 U.S. 266, 272 (2002). "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct. *United States v. Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir. 2013) (quoting *Arvizu*, 534 U.S. at 277).

The articulable facts forming the basis of a reasonable suspicion must be measured against an objective reasonableness standard, not by the subjective impressions of a particular officer. *Gonzalez-Rivera v. I.N.S.*, 22 F.3d 1441, 1445 (9th Cir. 1994). An officer is however, "entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975). But the inferences drawn from an officer's experience must be objectively reasonable. *United States v. Montero–Camargo*, 208 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

In relation to stops by Border Patrol agents, the totality of circumstances may include:

> (1) characteristics of the area; (2) proximity to the border; (3) usual patterns of traffic and time of day; (4) previous alien or drug smuggling in the area; (5) behavior of the driver, including obvious attempts to evade officers; (6) appearance or behavior of passengers; (7) model and appearance of the vehicle; and, (8) officer experience.

*United States v. Berber–Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007). "Not all of these factors must be present or highly probative in every case to justify reasonable suspicion[,] . . . [a]nd the facts must be filtered through the lens of the agents' training and experience." *United States v. Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir. 2013).

8

Guided by these factors the Court must determine whether the factors cited by the Government in support of the present stop constitute behavior that would excite the suspicions of a trained Border Patrol agent that criminal activity is afoot. *See United States v. Rodriquez*, 976 F.2d 592, 595 (9th Cir. 1992), *amended by United States v. Rodriquez*, 997 F.2d 1306 (9th Cir. 1993).

**A.  Characteristics of the Area, Proximity to the Border and Previous Smuggling in the Area**

At the time of the stop, Defendant was traveling on SR 90, a known route for drug and alien smuggling. Agent Agudio had 8½ years of experience in the area and had been involved in identifying and stopping smuggling on the route. Agent Agudio also emphasized that the SR 90 Border Patrol checkpoint was closed due to rainy weather and he was aware that scouts would relay this information to smugglers and increased smuggling activity would result.

Law enforcement's awareness that a particular route or location is predominantly used for illegal purposes, including alien and drug smuggling, is strong support for a finding of reasonable suspicion. *United States v. Manzo-Jurado*, 457 F.3d 928, 936 (9th Cir. 2006); *see also Arvizu*, 534 U.S. at 269, 277 (finding it significant that officers found defendant on an unpaved road used primarily by ranchers and foresters service employees, but commonly used by smugglers to avoid a nearby border checkpoint). However, there is nothing inherently suspicious about vehicles traveling on a public highway, *see United States v. Rodriquez*, 976 F.2d 592, 595 (9th Cir. 1992), and where the factors underlying the suspicion depict a very

9

1 large category of presumably innocent travelers, there is no reasonable suspicion. *United States v. Sigmond–Ballesteros*, 285 F.3d 1117, 1127 (9th Cir. 2002).

Here, Agent Agudio emphasized that SR 90 "leads away from multiple border cities." However, that testimony ignores that SR 90 breaks from SR 80 near the tourist town of Bisbee, Arizona, and connects the cities of Sierra Vista and Ft. Huachuca to Tucson and destinations beyond via Interstate 10. Tr. 44-45. Whether the checkpoint is open or not, SR 90 is a route used by substantial numbers of law-abiding individuals every day. Tr. 51 ("probably a thousand plus" vehicles pass Agent Agudio's location every day); Tr. 59 (approximately 600 cars pass location between 7:00 and 8:00 p.m.). The Ninth Circuit stated that "[a] location or route frequented by illegal immigrants, but also by many legal residents, is not significantly probative to an assessment of reasonable suspicion." *United States Manzo-Jurado*, 457 F.3d 928, 936 (9th Cir. 2006).

Officer Agudio also relied on the two marijuana seizures that occurred early that day to support the stop. However, the agent had not received a tip and there was no link between earlier stops and stop of Defendant's vehicle. Tr. 26, 61. While law enforcement may at times stop a vehicle based on a reliable tip from a confidential informant, *see United States v. Palos–Marquez*, 591 F.3d 1272, 1275 (9th Cir.2010) ("An officer may justify an investigatory stop based solely or substantially on an informant's tip, depending on its reliability."), the Government has presented no facts that would suggest that the earlier stops had any connection at all to the Defendant. In fact, in terms of raising suspicion of smuggling, the stops applied with equal force

to every vehicle traveling on SR 90 that day. As such, these factors merit little weight in the calculus of reasonable suspicion.

### B. Patterns of Traffic and Time of Day

While the totality of the circumstances analysis includes a consideration of the modes or patterns of operation of certain kinds of law-breakers, *United States v. Berber-Tinoco*, 510 F.3d 1083, 1088 (9th Cir. 2001), there was little information about this factor presented by the Government. Agent Agudio testified about the significant number of cars that pass that location each day, but did not indicate that the traffic pattern or time of day was a consideration in his decision to stop the Defendant's vehicle. The patterns of traffic and the time of the present stop carry no weight in the totality of the circumstances analysis.

### C. Behavior and Appearance of the Driver

According to Agent Agudio, the Defendant looked away from him and accelerated as he passed the agent's vehicle parked alongside SR 90. The agent found the Defendant's actions suspicious because he did not ignore the agent like other drivers, knowing that Border Patrol does not enforce traffic laws, would do when encountering a Border Patrol agent.

The Defendant's head movement, as described by Agent Agudio, deserves limited weight. Although a driver's reaction to the presence of law enforcement is a "quite natural reaction," *United States v. Robert L.*, 874 F.2d 701, 703 (9th Cir. 1989), the agent explained that innocent drivers at that location usually ignored him because they were aware that Border Patrol agents did not enforce traffic laws.

11

1 However, Agent Agudio was in an unmarked Ford F-150 truck that was not readily
2 identifiable as a Border Patrol vehicle. Thus, the agent's expectation that he would
3 be ignored because he was in a Border Patrol vehicle is substantially undermined.

4 Additionally, as the agent recognized, a reasonable driver could have been
5 concerned about the safety or potential movement of a vehicle inexplicably parked in
6 the median. Tr. 39. Agent Agudio testified that random vehicles are not usually
7 parked in the median of SR 90. Tr. 52. As his vehicle was unmarked, it appeared to
8 be just such a random vehicle and, as such, could reasonably be the subjection of a
9 passerby's suspicion.

10 With respect to the variation in speed, Agent Agudio did not provide a
11 detailed description of the acceleration of the vehicle, but he did agree that the
12 Defendant was not speeding or driving unsafely. Tr. 40-41. The Ninth Circuit has
13 accorded little weight to this sort of driving discrepancy, stating under similar
14 circumstances that, "[p]resumably, the only nonsuspicious conduct would be if the
15 driver kept constant speed while passing a Border Patrol car." *United States v.
16 Garcia-Camacho*, 53 F.3d 244, 247 (9th Cir. 1995). In the instant case, there is
17 additional reason to discount the acceleration as suspicious. There is a slight decline
18 just before and then an incline just after the location where Agent Agudio was
19 stationed. Tr. 67; Ex. 8 (photograph of incline). Even the agent agreed that it would
20 be reasonable to accelerate for the incline. Tr. 41. Thus, these facts (head movement
21 and acceleration) provide little weight to the Government's case.

22

### D. Characteristics of the Vehicle

Agent Agudio's was also suspicious because the Defendant's car was registered to the Defendant's Phoenix address and because it *had not* crossed into Mexico that day. The Court is at an utter loss for words to describe how little suspicion is raised by the presence of a vehicle registered in Phoenix traveling the highway near Sierra Vista and Ft. Huachuca. The car had the proper license plate and registration. Tr. 43. The vehicle did not display any of the usual suspicious factors offered in these cases: it was not driving in tandem, not stolen, not newly registered and not a rental car. Tr. 42-43, 46-47. Simply put, without more, the Court cannot place any suspicious weight on the fact that the vehicle was registered in Phoenix, even if it is as the agent indicated, a known drug hub.

The Government also contends that reasonable suspicion is supported by the fact that the vehicle had not crossed the border. The validity of this basis for suspicion is eviscerated by the agent's candid admission that he also would have been suspicious if the vehicle *had* passed through a port of entry into Mexico. Tr. 45-46. This is just the sort or "heads I win, tails you lose" proposition that the driver can only lose. *Robert L.*, 874 F.2d at 703. This is not to say that either going or not going into Mexico can never contribute to suspicion. However, additional facts, that are certainly not present in this case, would need to exist before suspicion based on that consideration could be found to be reasonable. Thus, the Court does not find the agent's testimony on this issue to be entitled to any weight.

### E. Officer Experience and Totality of Circumstances

The Court is cognizant of the directives of the Supreme Court that lower courts should not engage in a "divide-and-conquer" analysis. The Court also understands that police officers are not required to rule out the possibility of innocent conduct before they conduct a vehicle stop. However, the inferences made by the agent in this case were not reasonable. Most of the facts cited by the Government are based on broad profiles that are simply not reliable indicators of criminal activity. The Court finds that reasonable suspicion did not exist to believe that Defendant was engaged in illegal activity. The stop did not comport with the Fourth Amendment. *Compare Arvizu*, 534 U.S. 272 (finding reasonable suspicion where the driver slowed down after spotting a law enforcement vehicle, stiffened his posture and failed to acknowledge the officer; the car was on a little-traveled route used by smugglers to avoid a checkpoint; the stop occurred during a shift change; the driver had turned away from known recreational areas; and, as if instructed to do so, the children waved in a mechanical-like fashion for four to five minutes while they sat with their knees elevated as if concealing cargo in the passenger compartment); and *Valdes-Vega*, 738 F.3d at 1078 (finding reasonable suspicion where the location was commonly used by smugglers coming from Mexico; the car made it difficult for agents to see into and was of a type suitable for carrying large amounts of contraband; the car had Mexican license indicating it had recently crossed the border; the driving behavior was erratic (speeding excessively, changing lanes frequently,

14

weaving in and out of traffic and cutting off other drivers causing them to brake); and as the car approached the checkpoint, it first slowed down and then speeded up as if trying to get through the checkpoint quickly.). Experience alone may not be used to give an officer unbridled discretion in making a stop. *Nicacio v. INS*, 797 F.2d 700, 705 (9th Cir. 1986), *overruled in part on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999).

### III.     Recommendation for Disposition by the District Judge

Based on the foregoing and pursuant to 28 U.S.C. § 636(b) and Local Rule Civil 72.1, Rules of Practice of the United States District Court, District of Arizona, the Magistrate Judge recommends that the District Court, after an independent review of the record, GRANT Defendant's Motion to Suppress (Doc. 17).

This Report and Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment in the case.

Pursuant to 28 U.S.C. §636(b)(1)(B), the parties have fourteen (14) days from

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

the date of this Report and Recommendation to file written objections to these findings and recommendations with the District Court. Any Objections and Responses to objections filed should be filed as **CR 16-1654-TUC-RM**. No Replies shall be filed unless leave is granted from the District Court.

Dated this 14th day of April, 2017.

_____
Honorable Jacqueline M. Rateau
United States Magistrate Judge